350 F.3d 985
 Goodwin R. BRODIT, Petitioner-Appellant,
v.
Steven J. CAMBRA, Jr., Warden, Respondent-Appellee.
 No. 02-15323.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 10, 2003.
 Filed November 26, 2003.
 
 Ronald C. Tyler, Assistant Federal Public Defender, San Francisco, CA, for the petitioner-appellant.
 George F. Hindall, III, Deputy Attorney General, San Francisco, CA, for the respondent-appellee.
 Appeal from the United States District Court for the Northern District of California; Susan Yvonne Illston, District Judge, Presiding. D.C. No. CV-99-00093-SI.
 Before: ALEX KOZINSKI, SUSAN P. GRABER, and MARSHA S. BERZON, Circuit Judges.
 Opinion by Judge GRABER; Dissent by Judge BERZON.
 OPINION
 GRABER, Circuit Judge:
 
 
 1
 Petitioner Goodwin Brodit was convicted in state court of continuous sexual abuse of a minor, in violation of California Penal Code § 288.5, for engaging in sexual activities with his 10 year old stepniece. In this federal habeas petition, brought pursuant to 28 U.S.C. § 2254, he challenges his conviction on the grounds that the state-court procedures denied him due process of law and that he received ineffective assistance from his state trial counsel. We affirm.
 
 PROCEDURAL HISTORY
 
 2
 Petitioner was charged with violating section 288.5 by committing at least three lewd and lascivious acts with his stepniece while he was staying in the home of her mother and stepfather (Petitioner's brother), between June 12, 1992, and December 31, 1994. A jury convicted him. The state trial court sentenced Petitioner to serve a term in prison, pay restitution, undergo HIV testing, and register as a sex offender.
 
 
 3
 Petitioner pursued both a direct appeal and habeas relief through the state courts. He raised in state court all the claims that he brings before us. The California Court of Appeal consolidated the direct appeal with the state habeas petition and denied relief on all grounds, in an opinion that was published in part. People v. Brodit, 61 Cal.App.4th 1312, 72 Cal.Rptr.2d 154 (1998). On June 10, 1998, the California Supreme Court, in an unexplained order, denied Petitioner's requests for review. Under AEDPA, we "look through" unexplained decisions to the last reasoned state-court decision. See Gill v. Ayers, 342 F.3d 911, 917 & n. 5 (9th Cir.2003) (internal quotation marks omitted). Because the last reasoned state-court decision was the California Court of Appeal's consolidated review of Petitioner's direct appeal and habeas petition, we examine that decision here.
 
 
 4
 Having exhausted his claims in state court, Petitioner filed this federal habeas petition. The district court held an evidentiary hearing on Petitioner's claim of ineffective assistance of counsel. Thereafter, the district court rejected all of Petitioner's claims but issued a Certificate of Appealability on Petitioner's due process and ineffective assistance of counsel claims. This timely appeal ensued.
 
 STANDARD OF REVIEW
 
 5
 A federal court "shall not" grant a writ of habeas corpus to a state prisoner with respect to any claim adjudicated on the merits in state court unless the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d). This standard of review "demands that state-court decisions be given the benefit of the doubt." Woodford v. Visciotti, 537 U.S. 19, 24, 123 S.Ct. 357, 154 L.Ed.2d 279 (2002) (per curiam); see also Yarborough v. Gentry, ___ U.S. ___, 124 S.Ct. 1, 4, 157 L.Ed.2d 1 (2003) (per curiam) (citing Wiggins v. Smith, ___ U.S. ___, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003), for the proposition that the question for a federal habeas court is whether the state court's decision was "objectively unreasonable"); Early v. Packer, 537 U.S. 3, 11, 123 S.Ct. 362, 154 L.Ed.2d 263 (2002) (per curiam) (stating that, when it is reasonable to conclude that a constitutional violation did not occur, "the state court's determination to that effect must stand").
 
 
 6
 We review de novo a district court's denial of a petition for a writ of habeas corpus. McNeil v. Middleton, 344 F.3d 988, 994 (9th Cir.2003).
 
 DISCUSSION
 
 7
 California specifically criminalizes the repeated sexual abuse of a child by a person who resides in the same household:
 
 
 8
 Any person who either resides in the same home with the minor child or has recurring access to the child, who over a period of time, not less than three months in duration, engages in three or more acts of substantial sexual conduct with a child under the age of 14 years at the time of the commission of the offense... or three or more acts of lewd or lascivious conduct under Section 288, with a child under the age of 14 years at the time of the commission of the offense[,] is guilty of the offense of continuous sexual abuse of a child....
 
 
 9
 California Penal Code § 288.5(a). Section 288, in turn, deems a felony "any lewd or lascivious act ... upon or with the body, or any part or member thereof, of a child who is under the age of 14 years, with the intent of arousing, appealing to, or gratifying the lust, passions, or sexual desires of that person or the child."
 
 
 10
 There is no question in this case that Petitioner had recurring access to the child for more than three months, or that the child was younger than 14 at the time, or that the acts charged — including anal and vaginal intercourse — qualify as lewd or lascivious conduct. Rather, Petitioner questions the procedures that resulted in his conviction.
 
 A. Due Process Claims
 
 11
 California has developed several special rules for use in trials involving charges of sexual abuse of a child. Petitioner argues that four of these procedures denied him due process by impairing his ability to present a defense.
 
 1. California Penal Code § 288.5
 
 12
 Petitioner first contends that he was deprived of notice and a fair opportunity to respond to the state's charges, because section 288.5 allowed the state to charge him with three or more acts of sexual abuse occurring on unspecified dates between June 12, 1992, and December 31, 1994. See U.S. Const. amend. VI ("the accused shall enjoy the right ... to be informed of the nature and cause of the accusation"). The California Court of Appeal rejected those claims on the basis of the California Supreme Court's decision in People v. Jones, 51 Cal.3d 294, 270 Cal. Rptr. 611, 792 P.2d 643 (1990).
 
 
 13
 In Jones, the California Supreme Court considered a due process challenge to the application of California Penal Code § 288, a child molestation statute that criminalizes single instances of abuse. There, the charging document gave starting and ending dates for the period during which the alleged events took place but did not pinpoint a specific date for any one event. Noting the difficulties of proof posed when a child alleges ongoing abuse but cannot recall specific dates, the court held that a defendant could prepare a defense adequately even though allegations spanning a significant time period may preclude presentation of an alibi defense. The court reasoned that credibility is typically the major issue in child abuse cases, with most defendants denying not just specific incidents on specific dates, but denying that any abuse ever occurred at all. Id. at 319, 270 Cal.Rptr. 611, 792 P.2d 643. Defendants can take advantage of a variety of effective defenses even in the absence of specific dates; for example, they can testify and deny the allegations, advance positive character evidence, develop evidence of a child's motive to lie, and show alibis for some incidents that, if credible, could cast doubt on the child's entire account. Id. at 320, 270 Cal.Rptr. 611, 792 P.2d 643. That being so, the court concluded, due process is not violated by the absence in the charging document of precise dates. Id. at 320-21, 270 Cal.Rptr. 611, 792 P.2d 643.
 
 
 14
 Even the dissenting justice in Jones expressed the view that the newly enacted section 288.5 would cure the due process problems that the dissenter saw in section 288. Id. at 328-30, 270 Cal.Rptr. 611, 792 P.2d 643 (Mosk, J., dissenting). Indeed, several appellate cases, in addition to Petitioner's, have applied the reasoning in Jones to deflect due process challenges under section 288.5. See, e.g., People v. Gear, 19 Cal.App.4th 86, 23 Cal.Rptr.2d 261, 267-68 (Ct.App.1993); People v. Higgins, 9 Cal.App.4th 294, 11 Cal.Rptr.2d 694, 697-98 (Ct.App.1992).
 
 
 15
 Petitioner cites no clearly established United States Supreme Court precedent, and we are aware of none, that the California Court of Appeal contradicted or unreasonably applied in this portion of the analysis. Therefore, we affirm the district court's rejection of this claim.
 
 
 16
 2. California Evidence Code §§ 1253 and 1360
 
 
 17
 California Evidence Code § 1253 provides that, in child abuse or neglect proceedings,
 
 
 18
 evidence of a [victim's] statement is not made inadmissible by the hearsay rule if the statement was made for purposes of medical diagnosis or treatment and describes medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof insofar as reasonably pertinent to diagnosis or treatment.
 
 
 19
 California Evidence Code § 1360 creates an additional hearsay exception for "a statement made by the victim when under the age of 12 describing any act of child abuse or neglect performed with or on the child by another" if several conditions are met. The conditions include (as relevant here) requirements that the court find "that the time, content, and circumstances of the statement provide sufficient indicia of reliability" and that the child testify. Id. § 1360(a).
 
 
 20
 Petitioner's stepniece, the 10-year-old victim, testified at Petitioner's trial. Under the foregoing exceptions to the hearsay rule, additional testimony was admitted as well. A Child Protective Services investigator, a police detective, and the child's grandmother, mother, and aunt each testified to what the child had told them about the abuse. The child's therapist testified to what the child said about the abuse during their therapy sessions. Finally, a nurse-practitioner who had examined the child for physical evidence of abuse recounted what the child had told her about the abuse.
 
 
 21
 Petitioner argues that the application of these evidentiary statutes interfered with his ability to present a defense. The California Court of Appeal applied Whitman v. Superior Court, 54 Cal.3d 1063, 2 Cal. Rptr.2d 160, 820 P.2d 262, 273 (1991), which in turn distinguished Wardius v. Oregon, 412 U.S. 470, 93 S.Ct. 2208, 37 L.Ed.2d 82 (1973), to hold that Petitioner's right to due process was not offended by the prosecution's use of hearsay testimony under either statute. Brodit, 72 Cal. Rptr.2d at 161-62. The Court of Appeal reasoned that the exceptions are equally available to the prosecution and the defense. Id. at 161.
 
 
 22
 In Wardius, the Supreme Court held that an Oregon rule requiring a criminal defendant to disclose his alibi defense without authorizing reciprocal discovery against the state was fundamentally unfair. 412 U.S. at 476, 93 S.Ct. 2208. The Court made clear, however, that if the discovery rules had provided for reciprocal disclosures, they would not have offended the Constitution. Id. at 471 & n. 2.
 
 
 23
 Although sections 1253 and 1360 may prove helpful to prosecutors more often than to defendants, nothing in the text of either section bars a defendant from making use of a child's hearsay statements. Accordingly, the California Court of Appeal did not apply Wardius unreasonably, and we affirm the district court's denial of the writ on this claim.
 
 3. California Jury Instruction 2.20.1
 
 24
 California Jury Instruction ("CALJIC") 2.20.1 advises the jury in relevant part:
 
 
 25
 In evaluating the testimony of a child [ten years of age or younger] you should consider all of the factors surrounding the child's testimony, including the age of the child and any evidence regarding the child's level of cognitive development. A child, because of age and level of cognitive development, may perform differently than an adult as a witness, but that does not mean that a child is any more or less believable than an adult. You should not discount or distrust the testimony of a child solely because he or she is a child.
 
 
 26
 Petitioner argues that the giving of this instruction at his trial was unfair because the jury could have interpreted it to excuse inconsistencies or incompleteness in the child's testimony.
 
 
 27
 In rejecting Petitioner's due process challenge to CALJIC 2.20.1, the California Court of Appeal relied on three earlier child abuse cases that had upheld the same instruction against due process claims. In People v. Harlan, 222 Cal.App.3d 439, 271 Cal.Rptr. 653, 663 (Ct.App.1990), the court emphasized that "[t]he instruction simply requires jurors not to find child witnesses unreliable solely because of their age." In People v. Gilbert, 5 Cal.App.4th 1372, 7 Cal.Rptr.2d 660, 673 (1992), the court added:
 
 
 28
 The instruction provides sound and rational guidance to the jury in assessing the credibility of a class of witnesses as to whom "`traditional assumptions'" may previously have biased the factfinding process. Obviously a criminal defendant is entitled to fairness, but just as obviously he or she cannot complain of an instruction the necessary effect of which is to increase the likelihood of a fair result.
 
 
 29
 See also People v. Jones, 10 Cal.App.4th 1566, 14 Cal.Rptr.2d 9, 12-13 (1992) (agreeing with Harlan and Gilbert).
 
 
 30
 In Cupp v. Naughten, 414 U.S. 141, 142, 94 S.Ct. 396, 38 L.Ed.2d 368 (1973), the Supreme Court held that a state judge's instruction to a jury at a criminal trial advising that "[e]very witness is presumed to speak the truth," and explaining ways in which that presumption might be overcome, did not violate due process. (Internal quotation marks omitted.) Even if such an instruction were undesirable, erroneous, or universally condemned, a state conviction would not be overturned unless the instruction "violated some right which was guaranteed to the defendant by the Fourteenth Amendment." Id. at 146, 94 S.Ct. 396.
 
 
 31
 In view of Cupp's strict standard for evaluating state courts' jury instructions and the California Court of Appeal's reasoned explanation that CALJIC 2.20.1 merely prevents disregard of a child's testimony, but does not amplify the testimony, Petitioner's federal challenge must fail. The state court's decision did not contravene or unreasonably apply clearly established Supreme Court precedent. We therefore affirm the district court's rejection of this claim.
 
 
 32
 4. Child Sexual Abuse Accommodation Syndrome ("CSAAS")
 
 
 33
 As explained in the state-court record, CSAAS describes various emotional stages, experienced by sexually abused children, that may explain their sometimes piecemeal and contradictory manner of disclosing abuse. Under the CSAAS analysis, inconsistencies in a child's accounts of abuse do not necessarily mean that the child is lying. The child could be telling different parts of what happened to different adults, based on the child's comfort level with each adult or on the developmental immaturity of the child's memory.
 
 
 34
 Petitioner argues that the prosecution's presentation of CSAAS testimony made it impossible for him to defend himself because the expert "told jurors that no matter what a child says or does, it is consistent with the child['s] having been molested" and thereby "effectively insulated the child from Petitioner's challenges to her credibility."
 
 
 35
 In the unpublished portion of its opinion in this case, the California Court of Appeal rejected that argument, citing People v. Patino, 26 Cal.App.4th 1737, 32 Cal.Rptr.2d 345 (1994). Patino held that the use of CSAAS evidence in a child abuse case does not necessarily offend a defendant's due process rights. The court emphasized the importance of a cautionary instruction. Id. at 348-50. Such an instruction was given in this case.[1]
 
 
 36
 The Patino court relied on the Supreme Court's decision in Estelle v. McGuire, 502 U.S. 62, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991), which held that the admission of expert evidence on battered child syndrome did not violate a defendant's due process rights. Patino, 32 Cal.Rptr.2d at 351. Battered child syndrome seeks to explain physical injuries, rather than behavior. Nonetheless, the Court admonished generally that, while the Due Process Clause secures fundamental fairness for criminal defendants in state trials, it should not foster federal courts' undue interference with state criminal procedures. Estelle, 502 U.S. at 70, 112 S.Ct. 475.
 
 
 37
 More on point, we have held that CSAAS testimony is admissible in federal child-sexual-abuse trials, when the testimony concerns general characteristics of victims and is not used to opine that a specific child is telling the truth. United States v. Bighead, 128 F.3d 1329 (9th Cir.1997) (per curiam); United States v. Antone, 981 F.2d 1059 (9th Cir.1992). Although those cases did not address due process claims, both rejected the contention that CSAAS testimony improperly bolsters the credibility of child witnesses and precludes effective challenges to the truthfulness of their testimony — the very arguments that Petitioner advances here. See Bighead, 128 F.3d at 1330-31; Antone, 981 F.2d at 1062.
 
 
 38
 Once again, Petitioner cites no clear Supreme Court law that the California Court of Appeal violated or unreasonably applied. Once again, we affirm the district court's denial of the writ.
 
 5. Cumulative Due Process
 
 39
 We have recognized that "errors that might not be so prejudicial as to amount to a deprivation of due process when considered alone, may cumulatively produce a trial setting that is fundamentally unfair." Alcala v. Woodford, 334 F.3d 862, 883 (9th Cir.2003) (internal quotation marks omitted). Here, however, the California Court of Appeal reasonably concluded that the premise — that there were errors — is absent. The state court reasonably could conclude, in the circumstances of this case, that Petitioner had the requisite "fair opportunity to defend against the State's accusations." Chambers v. Mississippi, 410 U.S. 284, 294, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).
 
 
 40
 Because the California Court of Appeal neither made a decision that was contrary to, nor unreasonably applied, clearly established Supreme Court law in rejecting the components of Petitioner's cumulative due process claim and the claim as a whole, we affirm the district court's denial of the writ of habeas corpus with respect to the entire due process claim. We turn, then, to Petitioner's other claim.
 
 
 41
 B. Claim of Ineffective Assistance of Counsel
 
 
 42
 Petitioner argues that trial counsel was ineffective because he failed to present a type of expert evidence that the California Supreme Court authorized in People v. Stoll, 49 Cal.3d 1136, 265 Cal.Rptr. 111, 783 P.2d 698 (1989). Stoll held that a California judge could not exclude an expert opinion offered by a psychologist, who had examined and tested a defendant accused of child molestation, demonstrating that the defendant's personality did not fit the "profile" of a child molester. Id. at 707-14. The court reasoned that such testimony was admissible as character evidence tending to show that the defendant had not committed the crime. Id. at 707-08.
 
 
 43
 The California Court of Appeal evaluated Petitioner's claim under Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), which is the appropriate Supreme Court precedent to apply. Brodit, 72 Cal.Rptr.2d at 166. Under Strickland, to succeed in establishing a claim of constitutionally ineffective assistance, the petitioner must demonstrate (1) that counsel's performance was deficient and, if so, (2) that the deficiency prejudiced the petitioner. Strickland, 466 U.S. at 687, 694, 104 S.Ct. 2052. If the state court's rejection of either element of Petitioner's claim was reasonable, habeas relief is not available, because the Supreme Court requires that both elements be present to prevail.
 
 1. Counsel's Performance
 
 44
 Courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. at 689, 104 S.Ct. 2052 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)). The California Court of Appeal first acknowledged that, after trial, a psychologist interviewed and tested Petitioner and concluded that he "does not exhibit the usual characteristics of a resident child molester." Brodit, 72 Cal.Rptr.2d at 166. Citing Stoll, the court also noted that this kind of testimony may be introduced as character evidence in a criminal trial for deviant behavior against children. Id. In other words, the court recognized that favorable evidence could have been developed and presented at trial.
 
 
 45
 The California Court of Appeal held, however, that "defense counsel may have had sound tactical reasons for not going down that path in this case. For example, defense counsel could have feared that opening this door on [Petitioner's] personality would have permitted the prosecution to introduce damaging rebuttal character evidence." Id. (citing Cal. Evid.Code § 1102(b) and Stoll, 265 Cal.Rptr. 111, 783 P.2d at 712). In the federal habeas proceeding, Petitioner's trial counsel testified to his reasons for "not going down that path," and his reasons were just as the California Court of Appeal expected they would be.
 
 
 46
 Where trial counsel's actual reasons were the same kinds of reasons the state court ascribed to him after reviewing the record of the trial, we need not decide how we would review a case in which counsel's later-stated reasons conflict with, or cast doubt on the accuracy of, those imputed by the state court. See 28 U.S.C. § 2254(d)(2) (providing for the grant of a writ of habeas corpus to a state prisoner if the state court's decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding"). Nor, because of this congruence, do we need to decide whether the deference that we owe to state courts' determinations of fact applies to findings based on a review of the record alone. Compare Valdez v. Cockrell, 274 F.3d 941, 950-51 (5th Cir.2001) (holding that AEDPA deference applies to state-court findings of fact based on a review of the record), cert. denied, 537 U.S. 883, 123 S.Ct. 106, 154 L.Ed.2d 141 (2002), with Bryan v. Mullin, 335 F.3d 1207, 1215-16 (10th Cir.2003) (en banc) (holding that pre-AEDPA standards apply to ineffective-assistance-of-counsel claims unless the state court holds an evidentiary hearing).[2] Finally, because the district court credited counsel's testimony, we need not decide how we would resolve a case in which counsel's stated reasons were not believed.
 
 
 47
 Counsel's strategy was to present Petitioner as "a normal, regular guy" and to show that the child, who was "caught in the middle" of a breakup between her mother and stepfather, had a motive to fabricate a story of sexual abuse, perhaps to "draw attention to herself" or to "strike back at her mother." Counsel "shied away from" general character evidence, such as Stoll evidence, because he did not want to risk having the state introduce testimony concerning Petitioner's affair with his brother's wife (the child's mother), which occurred while Petitioner was living in the family home, and which the child had witnessed on one occasion. Counsel reasonably determinated that this evidence might have suggested to the jury that Petitioner "is not a good person." There also was evidence that the child resembled her mother and that the mother had broken off the affair, facts that would have enabled the state to argue that Petitioner may have abused the child as revenge against her mother or even as a means of imagining the continuation of the affair. Additionally, counsel was concerned about evidence of Petitioner's membership in FERET, an organization devoted to finding missing children. Counsel thought that this membership "could be misinterpreted.... We didn't want anybody to think that [Petitioner] had an inordinate interest in small children."[3]
 
 
 48
 We conclude that the California Court of Appeal's decision was not based on an unreasonable determination of the facts in the light of the evidence presented in the state-court proceedings and that the decision did not apply Strickland unreasonably. See Yarborough, 124 S.Ct. at 7 (holding that the California Court of Appeal's decision rejecting a Strickland claim at the "performance" step of the analysis was not objectively unreasonable and requiring "deference to the state courts that have primary responsibility for supervising defense counsel in state criminal trials"). Therefore, the district court did not err in rejecting Petitioner's claim of ineffective assistance of counsel.
 
 2. Prejudice
 
 49
 The California Court of Appeal decided, in the alternative, that "even if [the favorable Stoll] evidence had been admitted,... there is no reasonable probability the result of the proceeding would have been different." Brodit, 72 Cal.Rptr.2d at 167.[4] The court reasoned that the subjective opinion of one defense-paid psychologist, based on one 90-minute interview and a few standardized tests, would not have convinced any reasonable juror of the contours of Petitioner's personality, predisposition, or criminal guilt. Id.
 
 
 50
 Reasonable minds can differ with the state court's conclusion. This case mainly rested, after all, on a swearing contest between the child and Petitioner. There was no eyewitness and there was only minimal physical evidence of abuse.[5] But the very fact that the question is close dictates the outcome under our deferential standard of review. The California Court of Appeal did not apply Strickland unreasonably. Consequently, we must affirm the district court's rejection of Petitioner's claim of ineffective assistance of counsel.
 
 
 51
 AFFIRMED.
 
 
 
 Notes:
 
 
 [1]
 The state trial judge instructed, among other things, that the "testimony relating to the child sexual abuse accommodation syndrome" "is not received and must not be construed by you as proof that the alleged victim's molestation claim is true." The instruction went on to caution that CSAAS "research begins with the assumption that a molestation has occurred," while "you are to presume the defendant innocent. The People have the burden of proving guilt beyond a reasonable doubt."
 
 
 [2]
 Neither of the exceptions to deference that we have recognized previously applies to this case
 In Weaver v. Thompson, 197 F.3d 359 (9th Cir.1999), we held that no deference was owed to a trial judge's informal letter. Here, by contrast, the state court's determination that counsel may have followed a reasonable strategy was contained in a formal decision.
 In Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir.2002), cert. denied, 537 U.S. 1179, 123 S.Ct. 992, 154 L.Ed.2d 927 (2003), we held that no deference was owed in a situation in "which no adjudication on the merits in state court was possible." Here, adjudication on the merits in state court was possible and did in fact occur. Strickland does not require a separate hearing in every case. See, e.g., United States v. Hanoum, 33 F.3d 1128, 1131 (9th Cir.1994) (noting that a claim of ineffective assistance of counsel may be addressed on direct appeal in appropriate circumstances).
 
 
 [3]
 The fact that the state did not choose to present such evidence at the trial as it unfolded does not mean that it would have made the same choice had Petitioner profferedStoll evidence. Under California Evidence Code § 721(a), for example, the Stoll expert could have been cross-examined to reveal that Petitioner did not disclose either the affair with the child's mother or the FERET membership.
 
 
 [4]
 The Supreme Court has defined prejudice in the context of a claim of ineffective assistance of counsel as "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."Strickland, 466 U.S. at 694, 104 S.Ct. 2052. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." Id.
 
 
 [5]
 The child's hymen was intact. A physician testified that small bumps found in the child's vaginal area could be vaginal warts, indicative of sexual abuse, but also they could be normal lymphoid follicles that are not indicative of sexual abuse
 
 
 BERZON, Circuit Judge, dissenting:
 
 52
 I concur in Part A of the majority opinion. I conclude, however, that Brodit's counsel was ineffective under the standard established in Strickland v. Washington, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), and that habeas relief is available for that constitutional injury. I therefore respectfully dissent from Part B of the majority opinion.
 
 BACKGROUND
 
 53
 The majority opinion provides no factual background against which to evaluate the ineffective assistance claim. As I do not believe the contention can be adjudged outside of its factual context, I provide that context here.
 
 
 54
 Charging documents accused Brodit of a violation of California Penal Code section 288.5, alleging that he committed at least three lewd and lascivious acts with his step-niece Jane Doe.[1] These incidents purportedly occurred while Brodit was staying in the home of Jane's mother, Arcel, and step-father, John Brodit, his brother, between June 12, 1992 and December 31, 1994. The course of the ensuing trial was considerably influenced by the set of special rules that California has evolved for use in child abuse prosecutions. The existence of these rules, which I agree are valid under our precedents and in light of our deferential role under 28 U.S.C. § 2254(d), makes defending such cases exceedingly difficult by greatly limiting the options available to defense counsel. For that reason, failing completely to investigate a critical line of defense available in child abuse cases constitutes, in my view, ineffective assistance of counsel.
 
 A. The Trial
 1. The Prosecution Case
 
 55
 At Brodit's trial in April 1996, ten-year-old Jane testified that he had repeatedly engaged in anal and vaginal intercourse with her and had also initiated other sexual touching while living in her family's home. Jane asserted that the abuse had almost always taken place at night in Brodit's bed or in the bed she shared with her stepsister, while her stepsister was asleep.
 
 
 56
 Jane testified that she did not tell anyone about the abuse until January 1995, when she stayed home sick one day from school under the supervision of her maternal grandmother, Estrelita. According to Jane, she was watching television with Estrelita when a public service announcement about "good touching" and "bad touching" came on, prompting Estrelita to ask Jane if anyone had touched her in a bad way. Jane then told Estrelita that Brodit had sexually molested her.
 
 
 57
 On cross-examination, Jane alleged that John Brodit, her stepfather, had physically abused her, and added that she did not like living with John. She also stated that her mother was angry at John. The cross-examination brought out inconsistencies between details of the abuse that Jane had recounted to police and her testimony before the court. Jane also admitted on direct and cross-examination that she had viewed parts of sexually-explicit movies with some of her young relatives.
 
 
 58
 Although there were no eyewitnesses to the abuse, the prosecution supported Jane's account by presenting hearsay testimony from several witnesses pursuant to California Evidence Code sections 1253 and 1360, as discussed in the majority opinion. A Child Protective Services investigator, a police detective, and Jane's grandmother, mother, and aunt, each testified at trial about what Jane had told them about the alleged abuse. Susan Kuhn, Jane's therapist, testified as to what Jane said about the alleged abuse during their therapy sessions. Nancy Jo Elliff, a nurse-practitioner who had examined Jane for physical evidence of abuse, also recounted what Jane told her about the alleged abuse.
 
 
 59
 This hearsay testimony largely reiterated and supported the details of Jane's testimony, but both direct and cross-examination revealed inconsistencies among the various accounts of abuse Jane had given and shed light on her possible motives to fabricate allegations of abuse.
 
 
 60
 In particular, therapist Kuhn testified that Jane disliked and feared her stepfather John. Jane had told Kuhn that John physically abused her on several occasions. Jane's grandmother, Estrelita, and her mother, Arcel, testified that there was considerable marital discord between Arcel and John during the period in which the abuse allegedly occurred. The discord was so severe that Arcel and her children moved in and out of the family home several times. Estrelita's testimony, as well as Arcel's, also revealed that during the weekend immediately prior to Jane's first airing of the abuse allegation, Arcel and John took a trip together to attempt to resolve their marital problems. Although Estrelita denied that she was perturbed by John and Arcel's possible reconciliation, she admitted that she was concerned that the couple's frequent fights made the children unhappy.
 
 
 61
 Estrelita testified that Jane told her about the abuse in the context of a discussion about Jane's recurrent genital pain. When Estrelita noticed that Jane appeared upset during the discussion, Estrelita asked if anyone had hurt her. Jane then told Estrelita that Brodit had abused her.
 
 
 62
 To bolster Jane's credibility in light of some inconsistencies between the hearsay accounts of her previous statements and her trial testimony, the prosecution presented the testimony of Dr. Theresa Schuman, an expert on Child Sexual Abuse Accommodation Syndrome (CSAAS). Schuman stated that CSAAS describes various emotional stages experienced by sexually abused children that may explain an abused child's sometimes piecemeal and contradictory manner of disclosing abuse.
 
 
 63
 Schuman testified that, in the context of CSAAS, inconsistencies in a child's accounts of abuse do not necessarily mean that a child is lying. Such inconsistencies, Schuman asserted, could simply mean that a child is telling different parts of what happened to different adults, based on the child's comfort level with each adult or the developmental immaturity of the child's memory.
 
 
 64
 The prosecution presented minimal physical evidence of abuse. According to Elliff, the nurse-practitioner who examined Jane, Jane's hymen was still intact and the size of her vaginal opening was within the normal range of measurements for a girl her age. Dr. James Carpenter, the physician who consulted with Elliff on Jane's examination, testified that although he had initially thought that small bumps found in Jane's vaginal area could be genital warts, he now believed that they could also be normal lymphoid follicles not indicative of sexual abuse.
 
 
 65
 Both Elliff and Carpenter testified that it was not unusual for sexual abuse victims to have normal genital examinations. On cross-examination, however, Carpenter admitted that "full penetration through a seven- to ten-year-old hymen usually does leave findings" of hymenal disruption, although the findings could be minor in nature. Elliff also conceded on cross-examination that while the examination findings were not inconsistent with abuse, they were also consistent with the absence of abuse.
 
 2. The Defense Case
 
 66
 Brodit testified in his own defense, denying that he had ever abused Jane.
 
 
 67
 According to Brodit, he began living in John and Arcel's home in June 1993, moved out in November 1993, and returned in August 1994. He offered a partial alibi by testifying that during late 1994 he worked a graveyard shift security job that took him away from John and Arcel's home most nights, the time during which the abuse allegedly occurred.
 
 
 68
 Brodit further testified that in November 1993 he and Arcel fought over his view that her parenting skills were sub-par, and Arcel demanded that he move out. Brodit subsequently lived in the homes of two different friends until August 1994, when he and Arcel resolved their differences and Arcel permitted him to move back into the family's home. Toward the end of 1994, Brodit asserted, Arcel and John "constantly fought in front of their kids." Brodit also stated that in early 1995, before Jane made her allegations, he spoke to Estrelita about his concern that Arcel's children were adversely affected by their frequent moves in and out of the family home.
 
 
 69
 In response to questions about his sexual history, Brodit testified that he had sexual relationships with adult girlfriends in 1992, 1993, and 1994. He also stated that he was involved with Arcel's sister for a few months in 1991.
 
 
 70
 John Brodit testified on his brother's behalf. According to John, Brodit lived continuously with the family from August or September of 1994 until he moved out in January 1995, soon after Jane aired her allegations. Brodit worked the graveyard shift as a security officer during most of those months and so was not around the house after 10 at night. John also testified that he kept X-rated videos in the family home and subscribed to cable channels that carried sexually explicit programming.
 
 
 71
 John depicted his marriage to Arcel as tumultuous. He recounted that, when the two were making plans to go away together for the reconciliation weekend in January, Arcel did not want the plans discussed in front of the children because she feared they would tell Estrelita. Despite this, John said, he and Arcel did discuss their plans in front of his stepdaughter Jane.
 
 
 72
 Mica Brodit, John's daughter and Jane's stepsister, testified that she and Jane routinely slept together in the bottom bunk bed in the children's room at the family home, the same bed in which Brodit allegedly engaged in intercourse with Jane on multiple occasions. Mica stated that she woke up easily at night but never saw Brodit in the bunk bed. Nor did she ever see Jane sleeping in Brodit's bed. In addition, Mica testified that she, Jane, and other young relatives had watched parts of sexually explicit movies together. Mica's account was supported in this regard by the testimony of Brodit's 12-year-old nephew (Jane's step-cousin), who recounted that he Jane, and some other cousins watched a pornographic movie together on at least one occasion during the summer of 1994.
 
 
 73
 Defense counsel also presented character witnesses, including friends and relatives of Brodit who testified about Brodit's relationships with adult women and his general trustworthiness and helpfulness. Two of Brodit's friends testified that he lived with them and their young children in close quarters for several months in 1993 and 1994 without incident.
 
 
 74
 To attack the CSAAS testimony and possible physical evidence of abuse presented by the prosecution, the defense presented its own child sex abuse expert, Dr. Stewart Coleman. Coleman discussed various "red flags" that cast doubt on the reliability of a child's account of sexual abuse, including whether the child first mentioned abuse in the context of an adult asking her if she had been abused, and whether the adult who solicited the child's account of abuse "may have an agenda, may have an ax to grind, may have some feelings about certain people in the family." Coleman testified that these "red flags" existed with respect to the accounts of abuse Jane gave various adults, noting in particular that there was family conflict and that Estrelita broached the topic of abuse with Jane. Coleman also addressed the physical evidence, asserting that the small size of Jane's vaginal opening was inconsistent with repeated penetration.
 
 
 75
 During deliberations, the jury sent the court a note asking for clarification of Elliff's testimony regarding possible physical evidence of abuse. The record does not reflect whether the court responded. The jury deliberated from approximately the morning of April 25th to about 3 p.m. on April 26th, when it delivered its verdict of guilty. Brodit was sentenced to six years in prison and ordered to pay restitution, undergo HIV testing, and register as a sex offender for the rest of his life pursuant to California Penal Code section 290.
 
 B. Prior Proceedings
 1. State Proceedings
 
 76
 Brodit argued in the state courts that his trial counsel was constitutionally ineffective because he failed to present the psychological evidence authorized in People v. Stoll, 49 Cal.3d 1136, 265 Cal.Rptr. 111, 783 P.2d 698 (1989). See People v. Brodit, 61 Cal.App.4th 1312, 72 Cal.Rptr.2d 154 (1998) (published portion of California Court of Appeal decision).
 
 
 77
 Stoll held that a judge cannot exclude an expert opinion, offered by a psychologist who has examined and tested a defendant charged with committing lewd and lascivious acts upon a child, that shows the defendant's personality does not fit the profile of a child molester. 783 P.2d at 707-14. The Stoll court reasoned that the testimony is admissible as character evidence tending to show that the defendant did not commit the crime of child molestation. Id. at 707-10.
 
 
 78
 Without holding an evidentiary hearing on Brodit's ineffective assistance of counsel claim, the California Court of Appeal applied Strickland to hold that Brodit's counsel made a reasonable strategic choice not to introduce any expert opinion that Brodit lacked the personality characteristics associated with child molesters. The court noted that defense counsel may have feared that proffering Stoll evidence would open the door to the admission of damaging character evidence in rebuttal. Even if the Stoll evidence had been introduced, the court concluded, there was no reasonable probability that the outcome of the trial would have differed. The court agreed with the state's argument that it was "highly unlikely that the subjective opinion of one defense-retained psychologist... that [Brodit] did not fit the profile of a `typical' residential child molester would have changed the result in this case." Brodit, 72 Cal.Rptr.2d at 167.
 
 2. District Court Proceedings
 
 79
 On habeas review, the district court did hold an evidentiary hearing on the Stoll ineffective assistance claim. At the hearing, Brodit's trial counsel, Robert Beles, testified as a witness for the state. Beles asserted that his trial strategy was to present Brodit as "a normal, regular guy," and to show that Jane, "caught in the middle of a break up between John and Arcel," had reason to fabricate a story of sexual abuse in order to "attempt[] to draw attention to herself in perhaps getting her parents back together or possibly strike back at her mother."
 
 
 80
 Although Beles stated that he had presented witnesses who attested to Brodit's good character and trustworthiness around young children, he added that he "shied away from the pure character question in general," because he did not want the prosecution to introduce evidence concerning an affair Brodit had with Arcel while he was living at the family home, including evidence that Jane once saw the two having sex in a closet. Beles testified that such evidence might suggest to the jury that "[Brodit] is not a good person, and he might do some other bad things." Beles tried to think of ways that evidence of the affair could be used to Brodit's advantage — for example, to show that his sexual interest focused on adult women, not children — but concluded that the bad character shown by the affair "couldn't be overcome by any technical points that we might try and make ... the whole case relied on Goodwin making a nice impression with the jury."
 
 
 81
 Beles indicated, through his testimony and by alluding to the existence of some continuing education materials discussing Stoll evidence that he placed in Brodit's case file before the trial, that he knew of the possibility of pursuing Stoll evidence. Fear of opening the door to evidence of the affair, Beles maintained, was the primary motivating factor in his decision not to have a psychologist conduct an evaluation of Brodit to generate potential Stoll evidence for the trial. In Beles's view, had he proceeded that way, evidence of the affair would have been admissible on the theory that Jane looked much like her mother. A jury could reasonably conclude, Beles feared, that when Arcel broke off her relationship with Brodit he moved on to her daughter.
 
 
 82
 Beles mentioned that he was also concerned about other unhelpful information that might have become relevant if a Stoll expert had testified, namely, Brodit's membership in FERET, an organization devoted to finding missing children, which "could be misinterpreted.... We didn't want anybody to think that Goodwin had an inordinate interest in small children." Beles recognized, however, that evidence of Brodit's FERET membership could, conversely, have been helpful.
 
 
 83
 Beles asserted that, in his experienced opinion, the judge would definitely have permitted presentation of the FERET and affair evidence. On cross-examination, however, Beles admitted that he had never filed any in limine motions or sought any ruling to suppress evidence of the affair. He vaguely recalled that he may have agreed with the prosecutor in a pre-trial conference that information about the affair would not be introduced unless the door was opened to this type of rebuttal evidence, but the conference was not on the record and Beles did not remember clearly whether or not there was an agreement.
 
 
 84
 Experienced defense attorney Kathleen Coyne testified on Brodit's behalf as a Strickland and Stoll expert. Coyne stated that Stoll evaluations are routinely employed by defense practitioners handling child sex abuse cases. She stressed that the prosecution's evidence against Brodit was thin. Stoll evidence would therefore have been "extraordinarily potent," because testimony that "[Brodit] does not possess the character traits of deviants [sic] necessary to commit the offense is something that has an enormous comfort factor for a jury, and is some evidence which should always be considered in any case where the client's denying the guilt."
 
 
 85
 Coyne further opined that Beles had an incorrect understanding of the law regarding the possible adverse effects of introducing Stoll evidence. She noted, first, that Beles's concern that admitting Stoll evidence would lead to the admission of general character evidence was misplaced because Beles had already opened this door by introducing character witnesses; and, second, that Stoll evidence concerns a particular character trait, proclivity toward sexual activity with children, and thus only permits rebuttal evidence regarding that specific trait, not general character evidence.
 
 
 86
 Brodit also called psychologist Dr. David Stein as a witness. Stein testified that he was retained to evaluate Brodit at the time of Brodit's state appeal and habeas petition. For that purpose, Stein conducted a four-hour clinical interview with Brodit in 1997, during which he asked questions regarding Brodit's background, childhood, and sexual history. The sexual history part of the interview revealed "nothing characteristic of somebody who would show some intense interest in ... child molestation, his history seemed entirely consistent with somebody who would not be interested in that." Stein also recounted that he gave Brodit four different personality tests. The results of the tests, Stein asserted, "do not show anything that would suggest ... anything about sexual deviancy;" the personality characteristics revealed by the tests "are not typical of child molesters."
 
 
 87
 The state cross-examined Stein about Brodit's failure to disclose during the sexual history portion of the interview that he had an affair with Arcel in the period when the child abuse was allegedly occurring. Although Stein admitted that Brodit's withholding of this information "raises a flag," on redirect he stated that a person's non-disclosure of an affair with an adult does not indicate sexual deviance. The affair itself indicates moral lapses, Stein said, but not a proclivity to engage in deviant sexual acts.
 
 
 88
 To counter Stein's testimony, the state called psychology professor Dr. Judith Becker, an expert in the psychology of child molesters. Becker contended that child molesters are a heterogeneous group and rejected the idea of a fixed personality profile associated with a broad category of child molesters. She also asserted that the personality tests given to Brodit can be "faked" or may generate non-deviant results when taken by some child molesters, particularly incest offenders.
 
 
 89
 The district court found that Brodit had not shown that Beles's performance was deficient under Strickland, because introduction of Stoll evidence would necessarily have permitted damaging counter-evidence concerning the affair and the fact that Jane looked like Arcel. The district court also observed that, given the debate between Drs. Stein and Becker at the evidentiary hearing, Brodit could have lost a battle of Stoll experts. Accordingly, the district court concluded that Beles made a reasonable tactical decision not to investigate the presentation of Stoll evidence, because counsel believed that the costs of presenting such evidence out-weighed the benefits.
 
 
 90
 The district court found, in addition, that even if Beles's representation was deficient, Brodit had not shown the requisite prejudice. Because any Stoll evidence, in the court's view, would have been accompanied by evidence of the affair and Brodit's FERET membership — and would have involved simultaneously trying to present expert psychological testimony as legitimate (the Stoll evidence), while attacking other expert psychological testimony (the CSAAS evidence introduced by the prosecution) — there was no reasonable probability that the outcome of the proceedings would have been altered by the inclusion of Stoll evidence.
 
 C. Standard of Review
 
 91
 The majority maintains that full deference under the Antiterrorism and Effective Death Penalty Act ("AEDPA"), Pub.L. No. 104-132, 110 Stat. 1214 (1996), applies to the ineffective assistance of counsel claim despite the failure of the California Court of Appeal to hold an evidentiary hearing. I do not agree, but, as will appear, even if the majority were correct in this regard, I would find the AEDPA standard met.
 
 
 92
 This court has held that AEDPA's requirement of deference to the determinations of state courts does not apply to claims for which the state court did not hold an evidentiary hearing and therefore could not properly decide the merits. See Killian v. Poole, 282 F.3d 1204, 1208 (9th Cir.2002), cert. denied, 537 U.S. 1179, 123 S.Ct. 992, 154 L.Ed.2d 927 (2003). These claims are reviewed de novo. Id.[2]
 
 
 93
 Although the state Court of Appeal ruled on Brodit's ineffective assistance of counsel claim, it did not hold an evidentiary hearing on the issue. The Court of Appeal's discussion of the ineffective assistance claim reflects that it saw Dr. Stein's declaration stating that Brodit did not have the psychological profile of a child molester. Although the Court of Appeal speculated that Beles's failure to present Stoll evidence was a tactical choice because he "could have feared that opening this door on appellant's personality would have permitted the prosecution to introduce damaging rebuttal character evidence," Brodit, 72 Cal.Rptr.2d at 166, there is no indication that the court was informed about the actual rebuttal evidence Beles sought to keep out: the affair and FERET membership.
 
 
 94
 Nor did the Court of Appeal have before it all the facts pertinent to determining whether Brodit was prejudiced by the alleged ineffective assistance. Details of the uninvestigated Stoll evidence that could have been adduced in Brodit's favor and the precise nature of the adverse evidence Beles feared would come in were lacking. The Court of Appeal was therefore in no position to determine whether adverse evidence could have been averted and whether, on balance, there is a reasonable probability that if the Stoll evidence had been admitted, a juror would have had reasonable doubt concerning Brodit's guilt. See Rios v. Rocha, 299 F.3d 796, 813 (9th Cir.2002); Lord v. Wood, 184 F.3d 1083, 1095 (9th Cir.1999).
 
 
 95
 The majority opinion maintains that we should defer to the Court of Appeal's "factual" conclusions even though that court was speculating about possible tactical reasons, not finding facts. I disagree. While the facts developed by the district court may have been the same "kind of reasons" about which the Court of Appeal speculated, all detail was lacking in the state court proceedings. It was therefore impossible for the state court to evaluate the propriety of the reasons given with respect to either representation or, especially, prejudice. As will appear, evaluating each Strickland prong requires some means of determining whether Beles's guess that admission of adverse evidence could be the result of Stoll testimony was a blind stab or had a basis in the factual context considered as a whole, as well as in California law. Without full knowledge of the evidence at issue, the Court of Appeal had no way to evaluate that question and did not do so.
 
 
 96
 My difference from the majority on this AEDPA standard of review point is not, however, determinative. Even on the majority opinion's assumption that AEDPA deference applies, its conclusion on ineffective assistance of counsel is wrong, as I develop below.
 
 
 97
 D. The Merits of the Ineffective Assistance of Counsel Claim
 
 
 98
 Under the standard announced by the Supreme Court in Strickland, a defendant's claim that counsel was constitutionally ineffective cannot succeed unless he makes two showings: that counsel's representation was deficient; and that there is "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." 466 U.S. at 687, 694, 104 S.Ct. 2052.
 
 1. Deficient Representation[3]
 
 99
 Brodit contends that as a practical matter the California procedural rules applicable to residential child abuse cases require the defense to present some effective evidence beyond the defendant's denial of abuse. Stoll evaluations were therefore routinely obtained by defense practitioners at the time of Brodit's trial. According to Brodit, Beles's failure both to investigate Stoll evidence and to consider possible means of avoiding introduction of adverse character evidence constituted deficient representation.
 
 
 100
 Counsel's representation need only be reasonably effective to comport with a defendant's constitutional right to effective counsel. See Strickland, 466 U.S. at 687, 104 S.Ct. 2052. Judges must review counsel's performance deferentially, "indulg[ing] a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action `might be considered sound trial strategy.'" Id. at 689, 104 S.Ct. 2052 (quoting Michel v. Louisiana, 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)).
 
 
 101
 Where, as here, the ineffectiveness claim turns on a failure to investigate certain lines of defense at all, evaluation of the reasonableness of counsel's decision must "focus on whether the investigation supporting counsel's decision ... was itself reasonable." Wiggins v. Smith, 123 S.Ct.___ U.S.___, 123 S.Ct. 2527, 2536, 156 L.Ed.2d 471 (2003). Strickland put forth the following guidelines for determining whether counsel's strategic choices in failing to investigate might constitute ineffective assistance:
 
 
 102
 [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.
 
 
 103
 466 U.S. at 690-91, 104 S.Ct. 2052.
 
 
 104
 Moreover, "[a]s we noted in United States v. Span, 75 F.3d 1383, 1389 (9th Cir.1996), an attorney's performance is not immunized from Sixth Amendment challenges simply by attaching to it the label of `trial strategy.' Rather, `certain defense strategies may be so ill-chosen that they may render counsel's overall representation constitutionally defective.' United States v. Tucker, 716 F.2d 576, 586 (9th Cir.1983)." Silva v. Woodford, 279 F.3d 825, 846 (9th Cir.2002).
 
 
 105
 My evaluation of Beles's representation necessarily takes place against the backdrop of the generic nature of the offense with which Brodit was charged and the California evidentiary rules specific to child sexual abuse trials. By allowing convictions based on generalized assertions of three or more instances of sexual abuse without identification of the dates and specifics of each alleged incident of abuse, California Penal Code section 288.5 represents a policy decision to aid the state's ability to prosecute residential child molesters in light of the difficulties posed by a young victim's inability to recall details regarding the time, place, and circumstances of repeated assaults. See People v. Jones, 51 Cal.3d 34, 270 Cal. Rptr. 611, 792 P.2d 643 (1990). California Evidence Code sections 1253 and 1360 create hearsay exceptions that allow the state to bolster a firsthand victim account by permitting adults to repeat (and potentially refine) the child's allegations of abuse, even when the child testifies herself. Because these provisions enable allegations to be repeated multiple times through authoritative adult voices, a child's account of abuse may be significantly amplified.
 
 
 106
 The prosecution is further aided by the use of CSAAS testimony, which is offered to explain inconsistencies and inaccuracies in a child's narrative of abuse. CSAAS testimony may effectively neutralize the crucial defense strategy of highlighting testimonial lapses in order to attack the accuser's credibility. See United States v. Bighead, 128 F.3d 1329, 1331 (9th Cir.1997) (CSAAS testimony functioned to "rehabilitate[]" a victim's credibility after she was cross-examined about inconsistencies in her testimony and delays in reporting abuse).
 
 
 107
 In all these ways, California's system for defining and trying charges of child sexual abuse facilitates the state's ability to prove its case. In a prosecution where physical evidence of abuse is scant and eyewitnesses other than the victim are lacking — not an unusual circumstance — the trial boils down to a contest between the victim's account, as reinforced by prosecution-assisting aspects of California law, and the denial of the accused. Cf. id. at 1334 (Noonan, J., dissenting) (describing how relaxed prosecutorial requirements in sexual abuse cases leave a defendant with "only two defenses: to deny that the crime happened and to cast doubt on the credibility of his accuser").
 
 
 108
 In the context of these constraints, which have individual validity but can cumulatively suffocate a defense, California courts have recognized the import and utility of Stoll evidence to a defendant. See Jones, 270 Cal.Rptr. 611, 792 P.2d 643 (relying in part on the availability of Stoll evidence to uphold generic charges of child molestation against a due process challenge to California Penal Code section 288.5); Stoll, 265 Cal.Rptr. 111, 783 P.2d at 715 (reversing child molestation convictions where judge failed to admit Stoll evidence). We are thus presented with a rare case in which adequate investigation and presentation of character evidence was vital to a successful defense, contrary to Beles's uninformed understanding. This is a situation, in other words, in which counsel's options were necessarily limited. Closing off one of the few available options raises a strong likelihood of a professional error of constitutional magnitude. Compare Yarborough v. Gentry, ___ U.S. ___, 124 S.Ct. 1, 6, 157 L.Ed.2d 1 (2003) (per curiam) ("The issues counsel omitted were not so clearly more persuasive than those he discussed that their omission can only be attributed to a professional error of constitutional magnitude.").
 
 
 109
 More specifically: Given inconclusive physical evidence of abuse, Mica Brodit's testimony that she never saw Brodit in the bed she shared with Jane, and the absence of eyewitnesses, the prosecution's case rested entirely on Jane's testimony and the hearsay repetition of her allegations by several witnesses. Expert testimony that Brodit's psychological profile did not demonstrate a capacity to abuse children sexually could have lent critical credibility to Brodit's denials of abuse. See Brown v. Myers, 137 F.3d 1154, 1157 (9th Cir.1998) (omitted evidence "would have altered significantly the evidentiary posture of the case").
 
 
 110
 We accord less deference to counsel's strategic choices not to present potentially exculpatory testimony where counsel has not fully investigated whether a witness might be helpful to the defendant's case. See Lord, 184 F.3d at 1095; Sanders v. Ratelle, 21 F.3d 1446, 1456-60 (9th Cir.1994). Beles did not even take the threshold exploratory step of engaging a Stoll expert to interview Brodit. He was, as a result, unable to discover what an evaluation might reveal and whether evidence gleaned from a Stoll investigation might be helpful to his client's case. Without undertaking this first level of investigation, Beles could not make an informed decision about whether to present Stoll evidence at Brodit's trial. See Wiggins, 123 S.Ct. at 2538 ("counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to ... strategy impossible"); Sanders, 21 F.3d at 1457 ("Whatever decision [counsel] might have made ... was not an informed one and thus could not be deemed `strategic.'"); id. (noting the Third Circuit's statement in United States v. Gray, 878 F.2d 702, 711 (3d Cir.1989), that "counsel can hardly be said to have made a strategic choice against pursuing a certain line of investigation when s/he has not yet obtained the facts on which such a decision could be made").
 
 
 111
 In concluding otherwise, the majority relies exclusively on Beles's asserted reason for not pursuing a Stoll evaluation, namely, that he feared the admission of potentially damaging evidence of the affair and Brodit's membership in FERET. Although Beles may have legitimately feared this potentially adverse evidence, he admitted that he did not consider or attempt to make a pre-trial motion in limine to prevent its introduction. Instead, he incorrectly assumed that be would first have to introduce Stoll evidence at trial without knowing whether the judge would agree to keep out the other, potentially harmful evidence.
 
 
 112
 The majority ignores counsel's failure to file a motion in limine. Yet, "[a] decision not to investigate must be directly assessed for reasonableness in all the circumstances." Wiggins, 123 S.Ct. at 2541 (quotation marks and citation omitted) (emphasis added). Those circumstances must include the possibility of avoiding feared negative consequences of otherwise helpful evidence.
 
 
 113
 California state courts recognize pretrial motions in limine as useful tools precisely because such motions allow parties to resolve evidentiary disputes ahead of trial, without first having to present potentially prejudicial evidence in front of a jury. See, e.g., Edwards v. Centex Real Estate Corp., 53 Cal.App.4th 15, 61 Cal.Rptr.2d 518, 524 (1997) ("A motion in limine is made to exclude evidence before the evidence is offered at trial, on grounds that would be sufficient to object to or move to strike the evidence."); Kelly v. New W. Fed. Savs., 49 Cal.App.4th 659, 56 Cal.Rptr.2d 803, 808 (1996) (noting that pretrial motions in limine to preclude the introduction of prejudicial evidence "avoid the obviously futile attempt to `unring the bell'" once the evidence is aired before the jury). Contrary to Beles's testimony at the evidentiary hearing, motions in limine are apparently widely used by defense practitioners in child sexual abuse cases. See, e.g., People v. Otto, 26 Cal.4th 200, 10 Cal.Rptr.2d 327, 26 P.3d 1061, 1063 (2001) (motion in limine to exclude prior child sexual abuse convictions from proceedings to determine whether defendant should be adjudicated a Sexually Violent Predator); People v. Smith, 98 Cal.App.4th 1182, 120 Cal.Rptr.2d 185, 194 (2002) (motion in limine arguing that certain sexual abuse charges fell outside applicable statute of limitations); People v. McFarland, 78 Cal. App.4th 489, 92 Cal.Rptr.2d 884, 887-88 (2000) (motion in limine to restrict improper expert witness testimony regarding defendant's sexual proclivities); People v. Callahan, 74 Cal.App.4th 356, 87 Cal.Rptr.2d 838, 843-44 (1999) (motion in limine to exclude evidence of misdemeanor conviction for unlawful sex with a minor); People v. Harlan, 222 Cal.App.3d 439, 271 Cal.Rptr. 653, 655-56 (1990) (motion in limine to exclude evidence that male defendant wore women's underwear); People v. Barney, 143 Cal.App.3d 490, 192 Cal.Rptr. 172, 175 (1983) (motion in limine to exclude evidence of uncharged incest incidents). Beles therefore had a well-established route for addressing his evidentiary fears before deciding whether to present Stoll evidence: He could have gathered Stoll evidence and argued, in a motion in limine, why potentially damaging character evidence should not be admitted if the proposed Stoll evidence were presented.
 
 
 114
 Defense counsel's mistakes of law do not qualify as reasonable strategic choices under Strickland. See Williams v. Taylor, 529 U.S. 362, 395-96, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000) (finding deficient performance where defense counsel mistakenly believed that state law barred access to capital defendant's juvenile records, which contained useful mitigating evidence). It was therefore not a reasonable strategic decision for Beles completely to forego an investigation of Stoll evidence under the mistaken belief that there was no way to determine prior to trial whether the results of a Stoll evaluation could be admitted and potentially damaging character evidence kept out.
 
 As in Williams, counsel
 
 115
 failed to conduct an investigation that would have uncovered extensive records..., not because of any strategic calculation but because [he] incorrectly [understood] state law.... [N]ot all of the additional evidence was favorable to [the defendant] .... But ... the failure to introduce the comparatively voluminous amount of evidence that did speak in [his] favor was not justified by a tactical decision.... Whether or not those omissions were sufficiently prejudicial ... they clearly demonstrate that trial counsel did not fulfill [his] obligation to conduct a thorough investigation of the defendant's background.
 
 
 116
 529 U.S. at 395-96, 120 S.Ct. 1495.
 
 
 117
 In sum, Beles simply did not fulfill his duty to investigate either the facts or the law under the accepted professional standard. See Wiggins, 123 S.Ct. at 2536; ABA Standards for Criminal Justice 4-4.1(a) (3d ed. 1993) ("Defense counsel should conduct a prompt investigation of the circumstances of the case and explore all avenues leading to facts relevant to the merits of the case and the penalty in the event of conviction."). Where, as here, character evidence was a crucial component of a reasonably effective defense and there was a low-risk way to litigate in advance whether potentially damaging evidence could be kept from the jury after a proposed Stoll presentation, Beles's failure to investigate minimally whether useful Stoll evidence would be available and to consider competently whether a motion in limine would preclude his concerns reflected unreasonable professional judgment. The potential Stoll evidence was simply too important, given the constraints under which a child molestation defense must operate, to be cast aside without full factual and legal investigation of both its merits and its hazards.
 
 2. Prejudice
 
 118
 To show prejudice, a defendant must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different," Strickland, 466 U.S. at 694, 104 S.Ct. 2052, but "need not show that counsel's deficient conduct more likely than not altered the outcome in the case." Id. at 693, 104 S.Ct. 2052. The Supreme Court has defined a reasonable probability as "a probability sufficient to undermine confidence in the outcome." Id. at 694, 104 S.Ct. 2052.
 
 
 119
 This court has emphasized that "a probability sufficient to undermine confidence in the outcome" is a fairly low threshold. See Brown, 137 F.3d at 1157; Sanders, 21 F.3d at 1461. Where the deficient representation alleged is counsel's failure to introduce evidence potentially helpful to the defense, we ask whether the omitted evidence might have created reasonable doubt in the mind of a reasonable juror. See, e.g., Rios, 299 F.3d at 813; Lord, 184 F.3d at 1095.
 
 
 120
 Prejudice must be considered in light of the strength of the prosecution's case. Johnson v. Baldwin, 114 F.3d 835, 838 (9th Cir.1997). See also Strickland, 466 U.S. at 696, 104 S.Ct. 2052 ("[A] verdict or conclusion only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support."); Alcala v. Woodford, 334 F.3d 862, 872 (9th Cir.2003) (where case was only "weakly supported by the record" it was more likely to have been affected by counsel's failure to introduce alibi evidence).
 
 
 121
 The state's case against Brodit was quite vulnerable. Jane's physical condition was consistent with lack of abuse and, the medical testimony suggested, hard to square with the details of the abuse to which she testified. Aspects of Jane's testimony at trial were at times implausible and inconsistent with previous statements she made. Although Jane's accounts of the sexual abuse contained some level of precision, several witnesses established that she could have gained her precocious knowledge of sexual activities from watching sexually explicit movies. Jane's dislike of John Brodit and her possible desire for John and her mother Arcel to separate provided a compelling motive for concocting allegations of abuse against John's brother, Brodit, who lived in John's home. Moreover, Estrelita, the first adult to whom Jane reportedly recounted the abuse, may have had her own motives to break up John and Arcel. In both Jane's and Estrelita's accounts, which otherwise differed substantially, the abuse was disclosed after leading questions by Estrelita. Finally, Mica Brodit, Jane's step-sister and bedmate, testified that, despite Jane's claims of repeated abuse by Brodit in her shared bed when Mica was sleeping, she had never seen or been awakened by Brodit in the children's bedroom.
 
 
 122
 The jury did not arrive at its verdict quickly, taking a day and a half to deliberate. Cf. Jennings v. Woodford, 290 F.3d 1006, 1019 (9th Cir.2002) (noting that long jury deliberations — lasting two full days — confirmed that a different outcome was reasonably probable). The note written from the jury to the court during deliberations indicates juror concerns about the sufficiency of the physical evidence.
 
 
 123
 At trial, it was difficult for Brodit to mount a complete alibi defense, as the abuse charged in the indictment encompassed two and a half years and Jane's testimony was not specific as to the dates of the abuse. Accordingly, Brodit's defense relied heavily on the lack of physical evidence and a depiction of himself as a person unlikely to abuse a child sexually. Brodit's character presentation was therefore a crucial component of his defense. Augmentation of this defense could well have made a difference, as emphasized at the evidentiary hearing by attorney Kathleen Coyne. Cf. Bloom v. Calderon, 132 F.3d 1267, 1278 (9th Cir.1997) (where the defense case rested in part on a psychiatric defense, failure of counsel properly to prepare psychiatric expert witness prejudiced defendant).
 
 
 124
 In evaluating prejudice, however, we must consider the totality of the evidence before the jury, Strickland, 466 U.S. at 695, 104 S.Ct. 2052, including any rebuttal evidence that could have been admitted had Beles introduced the Stoll evidence. See Strickland, 466 U.S. at 699-700, 104 S.Ct. 2052 (noting with respect to prejudice that admission of potentially mitigating evidence that defense counsel failed to offer might have resulted in admission of harmful rebuttal evidence). Even if Beles had attempted to keep out potentially damaging character evidence through a motion in limine, the question remains whether such a motion would have succeeded.
 
 
 125
 Under California Evidence Code section 721(a), an expert witness may be fully cross-examined as to "the matter upon which his or her opinion is based and the reasons for his or her opinion." The state asserts that the prosecution would have been able to question a Stoll expert (just as the state questioned Dr. Stein in the evidentiary hearing) about whether Brodit told him about the affair and FERET membership, and how that information — or the non-disclosure of such information — might affect the expert's opinion. In addition, because the Stoll expert testimony could possibly be considered broadly as evidence of a character trait of disinclination to engage in sexual misconduct, it is conceivable that evidence of the affair would have been allowed in as rebuttal evidence. See Cal. Evid. Code § 1102(b) (prosecution may rebut character evidence presented by defendant).
 
 
 126
 Stein, however, adamantly resisted broad characterization of his Stoll testimony, maintaining that the psychological evidence he presented bears only on Brodit's propensity or lack of propensity to engage in deviant sexual activity, or, even more narrowly, deviant sexual activity with children. An adult's affair, Stein testified, may be immoral, but it is not deviant and would not be inconsistent with the normal profile Brodit presented. It is therefore unlikely that evidence of the affair was relevant to rebut Stein's Stoll testimony.
 
 
 127
 Even if negative character evidence would have been admissible, the state's assertion that it would have introduced such evidence is highly speculative at best. After all, Beles did put on character witnesses for Brodit, but the state declined to attack these witnesses' testimony through use of the affair and FERET membership evidence.
 
 
 128
 The state now proffers the theory that Jane and Arcel looked alike, so Brodit may have abused Jane as revenge for Arcel breaking off the affair. But this theory presumably could have been propounded, yet was not, as rebuttal to the non-Stoll good character evidence that was in fact presented at trial.
 
 
 129
 During his evidentiary hearing testimony, Beles vaguely recalled that the state's restraint may have been due to a gentlemen's agreement between the parties that such evidence would not come in unless the door was opened to it. Beles admitted his memory on this point was foggy, however. And the trial transcript indicates that the door to such evidence was opened: A friend of Brodit's specifically testified at trial regarding Brodit's dating relationships with adult women.
 
 
 130
 Finally, even if the Stoll evidence had been introduced at trial and the potentially damaging evidence admitted in rebuttal, it is reasonably probable that for at least one juror any negative character impressions generated by evidence of the affair and Brodit's FERET membership would have been out-weighed by the positive effects of a Stoll presentation. Stein, as noted, testified that a consensual sexual relationship with an adult — even when that relationship runs counter to dominant social mores — has no bearing on a person's propensity to engage in sexual misconduct with children. That Jane apparently saw her mother and Brodit having sex could provide a reason for her to focus on Brodit rather than his brother, John, in inventing an abuse story. This line of argument might have supported rather than detracted from the defense's theory of the case. In addition, evidence concerning Brodit's FERET membership might well have supported Beles's attempted depiction of Brodit as a caring individual who would not abuse a child rather than marking him as a pedophile.
 
 
 131
 In a case like this one, where the victim's allegations were unsupported by physical evidence of abuse and where alibis were difficult to construct due to the generic nature of the charges, it is reasonably probable that Stoll testimony could have provided an outcome-determinative edge by bolstering the defense's portrait of Brodit as a "normal, average guy" who did not have sexual interest in children. Even if the strength of the Stoll evidence were somewhat sapped by concomitant revelations of the affair and Brodit's FERET membership, as well as by attack from a prosecution expert, "`weak' prejudice is prejudice nonetheless." Caro v. Calderon, 165 F.3d 1223, 1228 (9th Cir.1999).
 
 
 132
 At a minimum, the Stoll presentation "would have given the jury a choice between believing" the defense's psychological profile of Brodit as a man unlikely to abuse children and the activities alleged by the prosecution. Alcala, 334 F.3d at 873. Given this choice, at least one juror could well have harbored reasonable doubt that Brodit abused Jane.
 
 
 133
 In sum, I conclude that if Beles had not erred by failing to investigate Stoll evidence and litigate in limine the admissibility of potentially damaging character evidence, it is reasonably probable that the outcome of Brodit's trial would have been different. Were I to analyze the issue under AEDPA standards, as does the majority opinion, I would reach the same result.
 
 
 134
 The California Court of Appeal did not reasonably analyze the facts before it under Strickland and its ruling was objectively unreasonable under 28 U.S.C. § 2254. In Stoll, the California Supreme Court found that exclusion of what is now called Stoll evidence prejudiced the defendant. 783 P.2d at 714. The Court of Appeal attempted to distinguish Stoll from Brodit's case as follows: "Here, there was no question about the identity of the molester, there was no apparent reason to invent the accusations, and there were [sic] no conflicting eyewitness testimony by other participants." Brodit, 72 Cal.Rptr.2d at 167 n Rptr.2d at 167 n. 14. Two of the three reasons the Court of Appeal gave for distinguishing this case from Stoll are inaccurate. There was, in fact, "apparent reason to invent the accusations," as Brodit stressed. Additionally, Mica, who claimed that she would have woken up in the bed she shared with Jane and witnessed any abuse, testified that she never saw Brodit there, despite Jane's allegation that abuse had taken place on several occasions while Mica was present.
 
 
 135
 The California Court of Appeal also relied on language from Stoll indicating that jurors would not regard Stoll evidence as independently conclusive of whether a defendant was a child molester. See 72 Cal.Rptr.2d at 167. Stoll, however, mentioned that consideration in the course of explaining why such evidence is admissible, not as a basis for holding that its exclusion cannot be prejudicial. Indeed, as noted, the exclusion was deemed prejudicial in Stoll. See Stoll, 265 Cal.Rptr. 111, 783 P.2d at 713-15. In Stoll, as here, there were other reasons for the jury to doubt the victim's account, and the Stoll evidence could have convinced one or more jurors to give voice to that doubt in reaching a verdict. See id. at 715. The Court of Appeal's analysis in this case is tantamount to a conclusion that exclusion of Stoll evidence can never be prejudicial under Strickland because it is not independently determinative. It therefore misapplies a binding state law precedent and is an objectively unreasonable application of Strickland. Accordingly, I would reverse the district court's denial of habeas relief on Brodit's ineffective assistance of counsel claim.
 
 CONCLUSION
 
 136
 California Penal Code section 288.5 allows conviction for sexual abuse of a child following generic charges. Other provisions of state law permit the amplification of victim allegations through hearsay and expert testimony. California thereby assists prosecutors in overcoming the formidable problems of proof they often face in child sexual abuse cases. Although the Court of Appeal did not act contrary to or unreasonably apply clearly established Supreme Court law in finding that California Penal Code section 288.5, California Jury Instruction 2.20.1, California Evidence Code sections 1253 and 1360, and the use of CSAAS testimony are consistent with due process, the prosecution's use of these tools in Brodit's trial has framed my analysis of his ineffective assistance of counsel claim.
 
 
 137
 The prosecution's deployment of this full arsenal on behalf of the victim's credibility, coupled with the generic nature of charges under section 288.5, heightened the importance of a vigorous character defense in Brodit's case. Defense counsel was constitutionally ineffective when he completely failed to investigate whether potentially exculpatory Stoll evidence existed and did not bring a motion in limine to determine whether Stoll evidence could be presented without opening the door to unfavorable character evidence. Despite the prosecution's systemic advantages, the weak evidence of Brodit's guilt compels the conclusion that it is reasonably probable that he would not have been convicted had Stoll evidence been investigated and introduced.
 
 
 138
 I therefore respectfully dissent.
 
 
 
 Notes:
 
 
 [1]
 The charging documents and much of the trial transcript refer to the child in this case by the pseudonym "Jane Doe." Accordingly, I will also use this pseudonym
 
 
 [2]
 The majority's citation ofUnited States v. Hanoum, 33 F.3d 1128 (9th Cir.1994), does not support its contrary conclusion. As we stated in Hanoum, "[t]his court usually declines to reach ineffectiveness challenges on direct appeal, because the claim cannot be advanced without development of facts outside the record." Id. at 1131 (emphasis added). Here, it was the evidentiary hearing held by the district court on habeas that produced the facts at the core of Brodit's ineffective assistance claim. The California Court of Appeal simply did not have before it a "sufficiently complete [record] to allow [it] to decide the issue." Id.
 
 
 [3]
 See Franklin v. Johnson, 290 F.3d 1223, 1233 n. 5 (9th Cir.2002) ("Cases applying the Strickland standard tend to refer to counsel's deficient `performance.' We prefer to discuss the quality of `representation,' to assure that we focus on the attorney's true obligation. That obligation, of course, is to forward one's client's interest as legally appropriate.").